NO. 13-56121

_____

In the
UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT
_____

SCOTT D. LEVY;
SCOTT D. LEVY & ASSOCIATES P.C.,

*Plaintiffs – Appellants,*

v.

CORINTHIAN COLLEGES, AKA Seal A;
ERNST & YOUNG LLP AKA Seal B;
DAVID MOORE, AKA Seal C;
JACK D. MASSIMINO, AKA Seal D,

*Defendants – Appellees.*

**Appeal from the United States District Court
for Central California, Los Angeles
No. 2:07-cv-01984-PSG-MAN**
_____

**REPLY BRIEF FOR APPELLANTS
SCOTT D. LEVY, AND SCOTT D. LEVY & ASSOCIATES P.C.**
_____

Scott D. Levy
Texas Bar No. 24000598
Law Offices of Scott D. Levy
& Associates P.C.
1844 Wheeler Street
Houston, Texas  77004
Tel:  (713) 528-5409
Fax:  (713) 528-0117

*Attorney for Appellants
Nyoka Lee and Talala Mshuja*

_____

# TABLE OF CONTENTS

Page

INTRODUCTION ……………………………………………… 3

A.   Appellees' attack on Relators' Counsel …………………….… … 6

B.   Three (3) "Public Disclosures" in Sanctions Ruling …………… 10

     1.   Congresswoman Waters Requests Investigation of U.S. Department of Education in Hearing …………… 11

     2.   Securities Class Action case (*Metzler*) …………………… 13

C.   E&Y is responsible under *Government Auditing Standards* ……. 15

D.   Four (4) Circuit Courts have Reversed Dismissal ……………… 17

E.   *Ad Rep Performance Flash* reports were not Disclosed …………. 18

F.   Appellees' Sanctions are a "*Sham Defense*" …………………… 20

G.   Hearing is Required before Sanctions …………………………….. 21

H.   Sanctions must be Supportable under Rule Cited ………………….. 21

I.   Bad Faith is required to sanction under Inherent Power ………… 22

J.   Appellees' Ask Court for Alternate Bad Faith Finding …………. 23

K.   Reliance on *Lahiri* Underscores the Weakness of Argument ……. 25

L.   American Rule on Attorney's Fees requires Bad Faith …………. 25

M.   Defense counsel's billing records filed *in camera* ……………….. 26

CONCLUSION ……………………………………………………. 27

CERTIFICATE OF COMPLIANCE …………………………… 29

CERTIFICATE OF SERVICE …………………………………. 29

i

## TABLE OF AUTHORITIES

<u>CASES</u>                                                           <u>Page</u>

*Alyeska Pipeline Services Co. v. Wilderness Society*,
    421 U.S. 240 (1973) ................................................................... 25

*Bain v. State Bar of Arizona*,
    433 U.S. 350 (1977) …………………………………………….. 18

*Freeman v. Lasky*,
    410 F.3d 1180 (9th Cir. 2005) ...................................................... 21, 21

*Gamble v. Pope & Talbot, Inc.*,
    307 F.2d 729 (3d Cir.) (en banc),
    *cert. den.*, 371 U.S. 888 (1962) ................................................... 3

*Hudson v. Moore Business Forms, Inc.*,
    836 F.2d 1156, 1163-64 (9th Cir. 1987) ....................................... 24

*Kottle v. Northwest Kidney Ctrs.*,
    146 F.3d 1056, 1060 (9th Cir. 1998) ............................................ 21

*Lahiri v. Universal Music & Video Distrib. Corp.*,
    606 F.3d 1216 (9th Cir. 2010) ...................................................... 24

*Leveski v. ITT Educational Services*,
    719 F.3d 818 (7th Cir. 2013) ........................................................ *passim*

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
    540 F.3d 1049 (9th Cir. 2008) ...................................................... 14, 14, 15

*Miranda v. Southern Pacific Transportation Co.*,
    710 F.2d 516 (9th Cir. 1983) ........................................................ 22, 23

*New Hampshire v. Maine*,
    532 U.S. 742 (2001) ..................................................................... 15, 16

*Roadway Express, Inc. v. Piper*,
   447 U.S. 752, 767 (1980) ........................................................ 22, 23

*Townsend v. Holman Consulting Corp.*,
   929 F.2d 1358, (9th Cir. 1990) (en banc) .................................... 24

*T.W. Elec. Service, Inc. v. Pacific Electric Contractors*,
   809 F.2d 626, 638 (9th Cir. 1987) ................................................ 22

*United States ex rel. Hendow v. University of Phoenix*,
   461 F.3d 1166 (9th Cir.),
   *cert. den.*, 550 U.S. 903 (2007) ..................................................... 4, 19

*United States ex rel. Leveski v. ITT Edu. Svcs.*,
   2012 WL 1028794 (S.D. Ind. 2012) ........................................... *passim*

*United States ex rel. Main v. Oakland City Univ.*,
   426 F.3d 914 (7th Cir. 2005) ....................................................... 19

*United States ex rel. Washington v. Education Management Corp.*,
   2012 U.S. Dist. LEXIS 67103 (W.D. Penn. 2012) ..................... 18

*United States ex rel Lopez v. Strayer Edu. Corp.*,
   No. 08-cv-00589 (E.D. Va. 2010) ............................................... 19

*United States ex rel. Schultz v. Devry, Inc.*,
   2009 WL 562286 (N.D. Ill. 2009) ............................................... 19

*United States v. Corinthian Colleges, Inc.*,
   655 F.3d 984 (9th Cir. 2011) ...................................................... *passim*

*Zambrano v. City of Tustin*,
   885 F.2d 1473 (9th Cir. 1989) .................................................... 3, 22, 23

## CONSTITUTIONAL PROVISIONS

First Amendment, Petition Clause, U.S. Constitution ........................... 18

## STATUTES

20 U.S.C. § 1070 *et seq.*, Higher Education Act ("HEA") ............. *passim*

20 U.S.C. § 1094(a)(20) ......................................................... 3, 12

28 U.S.C. § 1927 .................................................................. 1

31 U.S.C. §§ 3730-3733, False Claims Act ("FCA") ................. *passim*

31 U.S.C. § 3729(e)(4) ......................................................... 4

## REGULATIONS

34 C.F.R. § 664.14(b)(22)(ii)(A) (Nov. 1, 2002) .................................. 3, 3, 10

## RULES

Fed. R. Civ. P. 12(b)(6) ......................................................... 11

Fed. R. Civ. P. 56(d) ............................................................ 2

Fed. R. Civ. P. 26 ................................................................ 1

## OTHER AUTHORITIES

*Government Auditing Standards ("GAS")* ............................................. 16, 16, 17

*Noerr-Pennington* Doctrine ...................................................... 21

Scott D. Levy ("Levy"), and the law firm Scott D. Levy & Associates P.C. ("Firm"), Appellants herein, file this reply brief in response to the answering brief of Appellees Corinthian Colleges, Inc., Jack Massimino and David Moore (together "Corinthian"), and the answering brief of Appellee Ernst & Young LLP ("E&Y"). The district court awarded $1.5 million in attorney's as sanctions against Relators' Counsel under the court's inherent authority, and under 28 U.S.C. § 1927, holding that suit was brought for an "improper purpose" because Relators were spurred to file suit after learning of the $67 million settlement in the *University of Phoenix* case, and that Relators did not have the information necessary to support False Claims Act jurisdiction. The U.S. Department of Justice has filed a brief as *amicus curiae* asserting that the Relators provided critical information about Corinthian's recruiter compensation scheme that was not in the public domain.

Appellees charge that Relators' Counsel engaged in vexatious conduct by the filing routine pleadings in the district court:

1) Relators filed a separate Joint Rule 26 Statement after Appellees refused to produce a copy of Maxine Waters' Congressional testimony identified as an exhibit and asserted to be the basis of the public disclosure;

2) Relators filed Plaintiff's Supplemental Memorandum on Scheduling Order asserting that this Court's prior ruling precluded the district court from finding a public disclosure based on recruiter enrollment quotas under the doctrine

of judicial estoppel. This Court rejected Relators' assertion that recruiter enrollment quotas are a *per se* violation of the HEA recruiter compensation prohibition, and specifically held that the allegations of enrollment quotas was not a "false statement" within the meaning of the False Claims Act;

3) Relators made multiple requests for discovery of the *Ad Rep Performance Flash* reports at all 100 Corinthian campuses under Fed. R. Civ. P. 56(d);

4) Relators filed an Application for extension of time to respond to the motions filed by Appellees to dismiss for lack of jurisdiction, and to respond to the subpoenas propounded on Counsel by the Attorney General for the State of Illinois. The Application for extension after Corinthian disrupted a reputable law firm from joining as counsel for Relators by threatening to seek sanctions against the firm if it enrolled as counsel for the Relators;

5) Relators filed a motion for protective order one week before the schedule dates for Relators' depositions to resist Appellees' Request For Production of the highly privileged attorney-client communications between Relators and the U.S. Department of Justice requested by Appellees, and subsequently withdrew the request for protection after the completion of Relators' depositions;

6) Relators refused Appellees' demand to seal the evidence produced by Relators in the case; and

7) Relators challenged the completeness of the transcript of Nyoka Lee's deposition because it excluded statements by Corinthian's corporate counsel.

## INTRODUCTION

Corinthian and E&Y's have succeeded in delaying these proceedings a full seven (7) years since suit was filed in March 2007, which has allowed Corinthian to collected over $7 billion in that period. "It is the banal but brutal fact that justice delayed is justice denied." *Zambrano v. City of Tustin*, 885 F.2d 1473 (9th Cir. 1989), *citing Gamble v. Pope & Talbot, Inc.*, 307 F.2d 729 (3d Cir.) (en banc), *cert. den.*, 371 U.S. 888 (1962). Corinthian succeeded in getting the case dismissed initially on the flimsy and fanciful grounds that it rated "good" recruiters differently than "excellent" recruiters based on imaginary intangible criteria, and thus its mandatory recruiter enrollment quotas do not compensate recruiters based *solely* on their success in securing enrollments as prohibited by the Higher Education Act ("HEA"), 20 U.S.C. § 1094(a)(20), and the implementing safe harbor regulation, 34 C.F.R. § 668.14(b)(22)(ii)(A) (Nov. 1, 2002).

Corinthian prevailed in its argument to this Court that the documented enrollment quotas mandated of every recruiter working at the Company were protected conducted under the Safe Harbor Regulations that admittedly diluted the explicit statutory language in the Higher Education Act. Once the Court remanded the case to determine how Corinthian actually implements its written recruiter compensation program, the School made a complete reversal of position as to the legality of recruiter enrollment quotas. Appellees argued that the disclosure of enrollment quotas previously held to be perfectly legal under the Safe Harbor

Regulations should now be treated as the disclosure of fraud for purposes the FCA public disclosure bar, 31 U.S.C. § 3730(e)(4). No scheduling order has been entered in the case. The School has not produced a shred of evidence in the seven years of litigation, and has used the district proceedings to conceal evidence in the case from both state and federal regulators. At the same time Corinthian that the documents produced by Relators are proprietary trade secrets, never before disclosed to the public or the government, the School takes two contradictory positions: 1) Relators have no information whatsoever to support their allegations, and 2) Corinthian's illegal recruiter compensation practices were already publicly disclosed. By threats of sanctions and retaliation, Corinthian was able to deter a major law firm from enrolling as counsel to take over prosecution of the case. The School, furthermore, has almost thwarted the case from any effective appellate review by getting Relators' Counsel sanctioned to an extraordinary $1.5 million in attorney's fees based on the finding that Relators were spurred to file suit based on a $67 million settlement in the *University of Phoenix* case, a settlement that took place years after Relators filed suit.

Corinthian and E&Y succeeded in getting a summary judgment on the merits on the question of how Corinthian actually implements its written recruiter compensation program without any examination of the evidence produced by Relators, and with no discovery whatsoever allowed to Relators. Appellees have used sanctions proceedings not merely as a means to delay consideration of the

evidence, but to preempt any examination whatsoever of the evidence brought forth by Relators. Appellees have used a contrived attack on the attorney-client relationship between Relators and their legal Counsel to bypass review of review of the evidence disclosed by Relators. The district court admittedly did not review the *Ad Rep Performance Flash* reports submitted as Exhibit 1 to the Affidavit of Nyoka June Lee, and moreover ordered that evidence removed from the court record and returned to Counsel.[1] As for the 789 pages of documents produced by the Relators[2], the district court was unaware of these documents until well after it issued the sanctions order due to a clerk's error and this evidence was therefore not examined either. The district court likewise disregarded the deposition testimony of Nyoka Lee stating repeatedly that she was paid by solely on her "numbers." Thus, the only evidence before the Court is the Affidavit of Nyoka June Lee which clearly states she was paid by her "numbers" and identifies the *Ad Rep Performance Flash* reports used in her weekly evaluations throughout the term of her employment at Corinthian. This Affidavit of Nyoka Lee, by itself, entitles Relators to a trial by jury. Appellees recognize the Affidavit of Nyoka June Lee invalidates their original source and sanctions arguments.

---

[1] Relators have submitted that evidence to this Court as Supplemental Excerpts of Record, Vol. 4, UNDER SEAL.

[2] The 789 pages of documents were filed as exhibits to the deposition of Relator Nyoka Lee. Appellees did not include these deposition exhibits in their Supplemental Excerpts of Record, preferring to withhold the documents while they argue Relators are without knowledge or evidence.

## A.     Appellees' attack on Relators' Counsel

Corinthian is currently the target of so many government investigations that it has virtually no chance of surviving. Given the multiple state and federal investigations into just about every fraud imaginable committed by Corinthian, it's almost inconceivable that the Company will not end up in bankruptcy. As Congresswoman Waters pointed out, Corinthian's management were previously in charge of the defunct National Education Centers and just continued their old practices under the new umbrella of Corinthian Colleges. *See*, R. 125-1, p. 12 of 20. The strategy is to bilk the students and the American taxpayers to very last possible moment before it throws in the towel. E&Y is desperate to avoid responsibility for its repeated audit failures, fully aware that E&Y is going to be left holding the bag for its complicity in Corinthian's long-term illegal practices[3].

Just five days before Relators' depositions, U.S. Senator Frank Lautenberg and seven (7) other U.S. Senators requested an investigation into Corinthian's false reporting of its student loan default rate. *See*, R. 170-1, ER 419-421. Corinthian is now facing investigation by a multiple federal and state law enforcement agencies. California Attorney General Kamala Harris just sued Corinthian for "false and predatory advertising, intentional misrepresentations to students, securities fraud and unlawful use of military seals in advertisements." Corinthian is also under

---

[3] E&Y had an obligation as auditor to know its client and to take into account the fact that Corinthian's management was formerly part of the failed for-profit education chain National Education Centers.

investigation by a group of states into its recruiting and business practices. Federal investigators also are probing Corinthian. In June 2013, the Securities & Exchange Commission issued a subpoena to the company concerning student recruitment, degree completion, job placement, loan defaults and compliance with U.S. Department of Education regulations. In September 2013, Corinthian reported that the U.S. Department of Justice is investigating the company's recruiting and financial aid practices, and that the company manipulated attendance records to keep federal aid for students who were not in attendance. In December 2013, the Consumer Financial Protection Bureau notified Corinthian that it expected to pursue legal action against the company for violation of federal laws with respect to private student loans. In January 23, 2014, the U.S. Department of Education stated in a letter to the company denying its requests for approval to open any new locations or programs there were "systemic deficiencies," that the school was exceeding the statutory cap that allows only 90% of company revenues to come from the Title IV, HEA Programs[4]. The company "has admitted to falsifying placement rates and/or grad and attendance records at various institutions and because of ongoing state and federal investigations into serious allegations." Senator Richard J. Durbin wrote a letter to U.S. Secretary of Education Arne Duncan dated December 18, 2013 requesting an investigation into the truth of

---

[4] Enrolling veterans obtaining education funds under the GI bill is not counted towards the 90% limit.

7

allegations that Corinthian engaged in deceptive practices to "artificially boost job placement rates in an effort to mislead students …" through a subsidiary that paid local employers $2,000 to hire Corinthian graduates for temporary, 30-day positions, after which they were terminated. Senator Durbin's letter also alleges that Corinthian pays temp agencies to hire its graduates.

> Given that Corinthian Colleges received nearly $10 billion over the last decade in federal student aid funding, these practices and misrepresentations to students is an egregious misuse of taxpayer dollars. Today, I am asking the Department of Education to look in to these allegations and use whatever authorities it may have to hold Everest and its parent company, Corinthian Colleges, accountable. I am calling on you and this Administration to work with Congress to respond more aggressively to abuses against students and the public such as those perpetrated by Corinthian.

United States Senator Richard J. Durbin, December 18, 2013 letter to U.S. Secretary of Education Arne Duncan. The $10 billion of federal education dollars paid to Corinthian "*is an egregious misuse of taxpayer dollars*." At the same time Corinthian was fraudulently exploiting the easy access to federal education dollars, the public university systems across the United States were undergoing unprecedented budget cuts. While Corinthian was wasting well over a billion dollars annually, the University of California system was forced to eliminate full departments and forego research critical to the future in response to state and federal budget cuts in education funding. The loss to underprivileged students, the American taxpayer, and the legitimate education system is both significant and long term.

The Federal Reserve issued a report in 2013 saying that student loans have nearly doubled since 2007 to $1.1 trillion. Millions of students are falling behind on their payments. A disproportionate share of the loan defaults are coming from students at for-profit schools that have been labeled as "predatory" by the Obama Administration.  The for-profit schools receive about $36 billion annually of the federal education dollars.  The Federal Reserve noted this indebtedness will be an overhang on the U.S. economy for years to come, depressing demand for housing and dampening consumption. The for-profit education industry accounts for 25% of this amount. The drop-outs from the for-profit will be a permanent underclass, saddled with unmanageable debt and no training. The States are already feeling the pressure to subsidize this segment of society.

Corinthian charges students $47,000 a year for an associate degree, ten times the tuition of an associate degree at community colleges. Two-thirds of Corinthian's associate degree student drop out. Three-fourths of former students cannot pay their loans, and 36% default within three years, the highest default rate of all publicly-traded for-profit education companies. Corinthian gets 90% of its revenues from the federal government. Jack Massimino, its chief executive officer, receives a salary of $3.0 million a year.

9

## B.    "Public Disclosures" in Sanctions Ruling

The district court held in its sanctions order that there were three (3) different public disclosures in the case. First, under the endemic fraud theory, the district court held that "there were five other *qui tam* suits that constituted prior public disclosures." The U.S. Department of Justice has opposed this position in a brief as *amicus curiae*. Relators adopt the arguments made by the Department of Justice.  Next, the district court held that the testimony of Congresswoman Maxine Waters in 2005 was a public disclosure of recruiter compensation fraud by Corinthian. The substance of Congresswoman Waters' testimony was that Congress should investigate why the U.S. Department of Education has *failed to investigate* whether the fraud discovered at Corinthian's San Jose campus extended to Corinthian's other 99 campuses. Third, the district court held that the Relators' allegations were nearly identical to a securities class action suit filed against Corinthian. This Court has already ruled that recruiter enrollment quotas that are alleged in the securities class action case have already been held by this Court to be legal under the safe harbor regulations implementing the recruiter compensation prohibition, 34 C.F.R. § 668.14(b)(22)(ii)(A) (Nov. 1, 2002), in the first appeal of this case. The doctrine of judicial estoppel and the law of the case doctrine prevent the Appellees from reversing their position as to the legality of recruiter enrollment quotas.

1.    **Congresswoman    Waters    Requests    Investigation    of    U.S.  Department of Education in Hearing (R. 125-1)**

The testimony and prepared statement of Congresswoman Maxine Waters is anything but a public disclosure of illegal recruiter compensation at Corinthian Colleges. The hearings in question related to amending the 90-10 rule which allows for-profit colleges to receive a maximum of 90% of their revenues from Title IV, HEA Program funds.[5] Corinthian's former chairman, Appellee David Moore, had previously testified in support of abolishing the 90-10 rule to allow Corinthian and other for-profit schools to receive all 100% of their revenues from the federal student financial aid programs because it would expand access to education for minority students. Having witnessed the devastation on the African American and Hispanic students in her district brought about by Corinthian and similar for-profit education companies, Congresswoman Waters was deeply offended by Mr. Moore and Corinthian's professed altruism as the motivating factor in seeking to abolish the 90-10 limitation on federal student aid they could receive. Congresswoman Waters recounted a litany of failures by the U.S. Department of Education in policing the for-profit schools under their charge, giving as an example the *failure to investigate* other Corinthian campuses when its

---

[5] It is noteworthy that Corinthian has been called out for targeting military veterans because funds paid under the GI bill are not counted towards the 90% limit of HEA funding a for-profit school can receive.

San Jose campus was caught inflating the number of dependents on student loan applications in order to increase the amount of Title IV funds the student would be eligible to receive. The Congresswoman pointed out that the misconduct was likely committed by recruiters trying to reach their enrollment quotas. Congresswoman Waters laid the blame squarely on the U.S. Department of Education for passing the Safe Harbor Regulations, which she said allowed the thinly disguised enrollment quota arrangement that she considered to violate the spirit and intent of the incentive compensation ban in the statute, 20 U.S.C. § 1094(a)(20). Congresswoman Waters pointed out that Corinthian together with the Career College Association, the trade association of the for-profit education industry,[6] had lobbied the Department of Education to obtain adoption of the Safe Harbor Provisions after Congress refused to amend the recruiter compensation prohibition in 2001. She directly questioned why the U.S. Department of Education would give any credence to Corinthian's testimony considering the fact that its management was responsible for the failure of National Education Centers.

The Congresswoman criticized the *failure to investigate* Corinthian:

> *STUDENT COMPLAINTS AGAINST CORINTHIAN HAVE NOT BEEN INVESTIGATED*
> Neither the Department, Regional Office of the Office of Inspector General, nor the Bureau of Private Postsecondary Vocational Education in California (the state enforcement agency), have investigated the complaints of multiple Corinthian students

---

[6] The Career College Association is now renamed the Association of Private Sector Colleges and Universities.

12

which were sent to them, even though their claims were supported by twenty to thirty declarations made under penalty of perjury from both students and instructors from multiple campuses and courses of the Bryman chain, owned by Corinthian.

\* \* \*

*FINANCIAL AID PROBLEM AT CORINTHIAN CAMPUS OF BRYMAN IN SAN JOSE*

\* \* \*

The Department did act on a lead with respect to Corinthian's Bryman campus in San Jose, California. The number of dependents on students' financial aid applications were inflated to qualify for financial aid or more financial aid.

The admissions representatives were trying to meet their quotas, no doubt. Even though the audit found financial aid violations, there were no dire consequences for Corinthian imposed by the Department.

Further, the results of such audits show the value of the few remaining student and anti-fraud protections, which have also been undermined, specifically the prohibition against commissioned recruiters and incentive compensation.

\* \* \*

*DEPARTMENT'S INVESTIGATION AND PENALTIES ARE NOT SUFFICIENT*

Even when someone of acceptable credentials complains, and financial violations are found, like at the San Jose campus of Corinthian, the investigation is not extended to other campuses of the same chain to see if similar practices and financial violations exist. Rarely, with the exception of Computer Learning Center, do the trade schools face appropriate sanctions when violations are found.

Congresswoman Water's testimony about Corinthian's feigned altruism is highly worthy of the Court's attention. Appellees' self-portrayal as victims of abuse in these proceedings is just as false as the altruism professed in the hearings to abolish 90% cap of federal student financial aid.

**2.      Securities Class Action case**

In the securities class action case relied on by Appellees for their public disclosure argument, *Metzler Inv. GMBH v. Corinthian Colleges,* 540 F.3d 1049 (2008), this Court affirmed dismissal on the grounds that discovery of fraud at Corinthian's San Jose campus established no proof that the fraud was occurring company-wide. "The combined force of these statements does not suggest that the market was alerted to widespread enrollment and admissions fraud at Corinthian schools nationwide." *Metzler Inv. GMBH v. Corinthian Colleges,* 540 F.3d 1049 (2008).  The Court held in *Metzler* that the fraud alleged only related to a single Corinthian campus, and the fraud discovered related to falsely inflating the number of dependents on student loan applications to increase the amount of financial aid available to the student. The *Metzler* ruling is the corollary to the position taken by Congresswoman Waters, who complained because no investigation of Corinthian's campuses nationwide was undertaken following discovery of the fraud at Corinthian's San Jose campus.

The securities class action case also does not support Appellees' public disclosure argument because the fact that recruiters were required to meet enrollment quotas is a legal practice, consistent with the safe harbor regulation, under the Court's prior ruling in this case.   The allegations about illegal recruiter compensation in the securities class action case are based entirely on recruiter enrollment "quotas," "targets," and "goals." As the Seventh Circuit noted in the

*Leveski* decision, the previous *qui tam* action against *ITT Educational Services* may have appeared at "first blush" to be overlapping, a closer comparison of the first and second *qui tam* suits revealed distinct differences. There is no reference whatsoever to grading recruiters based on their Lead-to-Conversion Ratios, and the reporting of those Ratios on the weekly *Ad Rep Performance Flash* reports which the U.S. Department pointed out in its *amicus brief* was information that was unknown to the Government.

The *Metzler* suit also fails as a public disclosure under the doctrine of judicial estoppel, which equitably bars Corinthian and E&Y from reversing their position as to the legality of enrollment quotas. *New Hampshire v. Maine*, 532 U.S. 742 (2001). "The purpose of the doctrine is to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment." *Id.*

> Where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position.
> *     *     *
>
> This rule, known as judicial estoppel, "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase."
> *     *     *
> "absent any good explanation, a party should not be allowed to gain an advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory."

*New Hampshire v. Maine, id.* Appellees have made a complete back-track from their position in the previous appeal in this case.


## C.    E&Y's responsibility under *Government Auditing Standards*

There is zero discussion by E&Y about its audit responsibility under *Government Auditing Standards*.   No responsibility whatsoever. Corinthian essentially had one source of revenue:  the U.S. Government. With 90% of its revenues coming from federal student financial aid programs, E&Y completely abdicated its audit responsibility by failing to address the compliance question of Corinthian's recruiter compensation.   E&Y's audit responsibility under *Government Auditing Standards*. More than 25% of Corinthian's revenues are used for recruiter compensation and marketing, and it is beyond dispute that recruiters are paid significantly more that teachers at Corinthian. The Company had 1700 full-time recruiters, and 1460 full-time faculty. Evaluation of recruiter compensation was highly material to Corinthian's financial standing from several standpoints.

E&Y argues that its audit opinions contained a disclaimer of responsibility for determining Corinthian's compliance with the eligibility requirements contained in the Higher Education Act for receiving Title IV, HEA Program funds, while E&Y's opinions state directly to the contrary. Nothing could be further from the truth. E&Y issued clean, unqualified opinions that it audited Corinthian

consistent with *Government Auditing Standards*. E&Y *Government Auditing Standards* opinion clearly states that E&Y rendered an opinion on Corinthian's compliance with the Institutional Eligibility requirements. *See*, Dist. Ct. Dkt. # 37-2, Page 2 of 2, which provides in pertinent part:

INDEPENDENT ACCOUNTANTS' REPORT ON COMPLIANCE WITH SPECIFIED REQUIREMENTS APPLICABLE TO THE SFA PROGRAMS

> We have examined management's assertions, that Corinthian Colleges, Inc., Everest College, Bremerton (the Institution) complied with the specified compliance requirements regarding Institutional Eligibility …
> \* \* \*
>
> Our examination was conducted in accordance with *Government Auditing Standards*, issued by the Comptroller General of the United States; attestation standards established by the American Institute of Certified Public Accountants; and the Audit Guide, *Audits of Federal Student Financial Assistance Programs at Participating Institutions and Institution Services,* issued by the U.S. Department of Education, Office of Inspector General, [2000 Revision …
> and accordingly, included examining, on a test basis, **evidence about the Institution's compliance with those requirements and performing such other procedures <u>as</u> <u>we</u> <u>considered</u> <u>necessary</u> <u>in the</u> <u>circumstances</u>**. We believe that our examination provides a reasonable basis for our opinion. Our examination does not provide a legal determination on the Institution's compliance with specified requirements.
>
> **In our opinion, <u>the</u> <u>Institution</u> <u>complied,</u> <u>in</u> <u>all</u> <u>material respects</u>**, with the aforementioned requirements for the fiscal year ended June 30, 2008.

E&Y was responsible for determining the scope of the audit which E&Y *considered necessary in the circumstances*. E&Y plainly states that it examined the compliance requirements related to institutional eligibility, which means the laws

and regulations under which Corinthian receives money from the U.S. Government. To fail to perform the compliance work when Corinthian was receiving 90% of its revenues from the United States is essentially to perform no audit at all, and no reasonable auditor would have excluded compliance work from the scope of its audit in these circumstances.

E&Y's defense is fixated on a single dinner between Relators and their Counsel. E&Y's brief continues to engage in fanciful speculation and accusations about Counsel and a well-established client, Susan Newman, and how she came to know the Relators. E&Y persists in its speculation that Relators were recruited, and refuse to acknowledge Relators' testimony and the email correspondence for the United States Attorney's office that the initial suit discussed was against a different company entirely. Contrary to E&Y's accusation that "educating" a client is improper, the Seventh Circuit ruled in *Leveski* that informing the client of her potential claims is an essential part of providing legal advice. As the Supreme Court held in *Bates v. State Bar of Arizona*, 433 U.S. 350 (1977), the right of lawyers to advertise is commercial speech protected under the First Amendment.

### D.    Four (4) Circuit Courts have Reversed Dismissal

The court explained in *United States ex rel. Washington v. Education Management Corp.*, 2012 U.S. Dist. LEXIS 67103 (W.D. Penn. 2012) ("*Education Management*") that three (3) recent courts of appeals rulings reversed the dismissal

of False Claims Act cases based on violations of the incentive compensation prohibition on recruiters employed by for-profit companies.[7]  Added to this list is the Seventh Circuit's extensive decision in *Leveski v. ITT Educational Services*, 719 F.3d 818 (7th Cir. 2013).[8]

## E.    *Ad Rep Performance Flash* **reports were not Disclosed**

Corinthian has introduced uncontroverted evidence that the documents disclosed by Relators have never been publicly disclosed. Corinthian's Application for Protective Order asserted that the evidence produced by Relators contained confidential business records that have never previously been disclosed. R. 177. The Application is suppaorted by the Declaration of Roger Van Duinen, vice-president of marketing, who claims responsibility over all of Corinthian Colleges' marketing activities, which asserts that the *Ad Rep Flash Reports* contain the "School's confidential business practices ….  The School treats these reports as confidential because they include sensitive business information." (R. 177-1).

2.    Corinthian Colleges (the "School") has used various reports, some of which I understand have been referred to in this litigation as

---

[7] The three decisions cited by *Education Management* are *United States ex rel. Main v. Oakland City Univ.*, 426 F.3d 914 (7th Cir. 2005), *United States ex rel. Hendow v. University of Phoenix*, 461 F.3d 1166 (9th Cir. 2006), and *United States ex rel. Lee v. Corinthian Colleges*, 655 F.3d 984 (9th Cir. 2011).

[8] Retraction regarding Gibson Dunn:  Gibson Dunn did not serve as counsel for defendant in either *U.S. ex rel. Lopez v. Strayer Edu Corp.,* NO. 08-cv-00589 (E.D.Va. 2010) or *U.S. ex rel. Schultz v. Devry*, 2009 WL 562286 (N.D. Ill 2009).

"Ad Rep Flash Reports," to track admissions activity at the School and monitor employee performance. These reports are generated from proprietary School databases and reflect the School's confidential business processes for encouraging attendance and admitting students, and for tracking and reporting employee performance.

3.     The School treats these reports as confidential because they include sensitive business information about the School's encouraging attendance and enrollment activities that could he harmful in the hands of competitors. These types of documents also reflect business processes the School uses to ensure that its operations are running efficiently, effectively, and in compliance with applicable rules and regulations, all of which give the School a competitive advantage.

The *Ad Rep Flash Reports* show the Lead-to-Conversion Ratios for recruiters employed at Corinthian Colleges.  There is no dispute that these *Ad Rep Flash Reports* have never been publicly disclosed.  The *Ad Rep Flash Reports* demonstrate that Corinthian compensates its recruiters based solely on their success in securing enrollments in violation of the HEA.  Corinthian's counsel Blanca F. Young even provided her personal Declaration attesting that *Ad Rep Flash Reports* and other recruiter compensation documents have never been placed in the public domain.

The School Defendants requested the Proposed General Protective Order because this lawsuit concerns the School's compensation practices for employees involved in admissions activities at the School, and the School Defendants were concerned about protecting the confidentiality of documents that may be relevant to the case including employee compensation records and personnel files, and the School's proprietary and competitively sensitive documents reflecting how it compensates and tracks performance of its employees.

R. 177-2). These are judicial admissions that contradict the entire premise of Defendants' public disclosure argument! There in fact has been no public disclosure the *Ad Rep Performance Flash* reports, a fact defense counsel has personally admitted to the Court in her Declaration.

## F.      Appellees' Sanctions are a "*Sham Defense*"

Corinthian and E&Y's sanctions arguments are a sham. In analyzing the reach of the *Noerr Pennington* rights to petition the courts, this Court has recognized that defenses asserted that involve making deliberate misrepresentations to the court fall within the sham litigation exception. "'A party's knowing fraud upon, or its intentional misrepresentations to, the court deprive the litigation of its legitimacy.'" *Freeman v. Lasky*, 410 F.3d 1180 (9th Cir. 2005), *citing Kottle v. Northwest Kidney Ctrs.*, 146 F.3d 1056, 1060 (9th Cir. 1998).

> *Noerr-Pennington* immunity, and the sham exception, also apply to defensive pleadings, *see In re Burlington N., Inc., 822 F.3d 518, 532-33 (5th Cir. 1987)*, because asking a court to deny one's opponent's petition is also a form of petition; thus, we may speak of a "sham defense" as well as a "sham lawsuit." * * *
> For a defense of a lawsuit to be a sham for purposes of the first *Kottle* exception, plaintiffs would have to show that the defense was not merely baseless, but aimed at interfering with their business by, for example, sapping their financial resources and distracting their attention.

*Freeman v. Lasky, id.*

## G.     Hearing is Required before Sanctions

A hearing is required before sanctions may be imposed. *Zambrano v. City of Tustin*, 885 F.2d 1473 (9th Cir. 1989). "[F]undamental fairness requires a pre-deprivation hearing before the court may order sanctions." *Zambrano, id., citing Miranda v. Southern Pacific Transportation Co.*, 710 F.2d 516, 523 (9th Cir. 1983) ("Absent extraordinary circumstances, procedural due process requires notice and a hearing before any governmental deprivation of a significant property interest."). *See also, Roadway Express, Inc. v. Piper*, 447 U.S. 752, 767 (1980). "Notice and a hearing should precede imposition of sanction under [28 U.S.C.] § 1927". *T.W. Elec. Service, Inc. v. Pacific Electric Contractors*, 809 F.2d 626, 638 (9th Cir. 1987).

## H.     Sanctions must be Supportable under Rule Cited

"In determining the validity of any judicial sanction, we must first consider the underlying authority for the court's action." *Zambrano* at 1477. "For a sanction to be validly imposed, the conduct in question must be sanctionable under the authority relied on." *Cunningham v. County of Los Angeles*, 869 F.2d 427, 436 (9th Cir. 1989) (quoting *McCabe v. Arave*, 827 F.2d 634, 639 (9th Cir. 1987).

## I.      Bad Faith is required to sanction under Inherent Power

A finding of bad faith is a prerequisite before sanctions may be imposed under a court's inherent power. *Roadway Express, id.,* 447 U.S. at 765-66. Like the case at hand, *Roadway Express* specifically dealt with the payment of attorney's fees to opposing counsel.

> To insure that restraint is properly exercised, we have routinely insisted upon a finding of bad faith before sanctions may be imposed under the court's inherent power.

*Zambrano, id.* at 1478. [citations omitted].

The legal parameters for awarding sanctions under the court's inherent authority is explained in the Ninth Circuit's seminal *Miranda*[9] decision, which requires bad faith conduct on the part of the sanctioned parties as a limitation on the court's inherent authority to award sanctions.

> Our holding in *Miranda* has been routinely cited for the proposition that the power of the trial court to impose sanctions is limited by the court's inherent power and, by implication, by the requirement of bad faith conduct on the part of the sanctioned parties.

Federal courts are authorized to impose a "relatively mild" form of sanctions as means to preserve authority over the bar. *Miranda*, 710 F.2d at 519. As noted in *Zambrano*, Congress "did not intend to permit the federal courts to arrogate unto

---

[9] *Miranda v. Southern Pacific Transportation Co.*, 710 F.2d 516 (9th Cir. 1983).

themselves substantial powers over litigants or members of the bar. … However, the legislative grant of power is not a discretionless or roving commission for the district court to bludgeon violators of local or federal rules." *Zambrano, id.* at 1479-1480.

## J.    Appellees' Ask Court for Alternate Bad Faith Finding

Recognizing that the "improper purpose" finding made by the district court that Relators were spurred to file suit after learning of the $67 million settlement in the *University of Phoenix* case is unsustainable under any standard of review, the Appellees urge the Court to affirm the bad faith finding "on any ground supported by the record … not limited to the district court's factual finding." Appellees argue that the Court should consider the amount of the damage claim made against them to support a finding of bad faith against Relators' Counsel. Corinthian relies on *Townsend v. Holman Consulting Corp*., 929 F.2d 1358, (9th Cir. 1990) (en banc). *Townsend* explained that an excessive damage claim could be the basis to support a finding of improper purpose in the circumstances of *Hudson v. Moore Business Forms, Inc.*, 836 F.2d 1156, 1163-64 (9th Cir. 1987), where the defendant asserted an unconscionable $4.0 million counterclaim that "had no plausible factual or legal basis and was made for the improper purpose of harassing Hudson [the plaintiff]."

**K.      Reliance on *Lahiri* Underscores the Weakness of Argument**

The district court and Appellees rely extensively on *Lahiri v. Universal Music & Video Distrib. Corp.,* 606 F.3d 1216 (9th Cir. 2010), to justify that sanctions award. The plaintiff *Lahiri* continued to prosecute after the U.S. Supreme Court issued a ruling that completely invalidated the cause of action asserted in the case. In upholding the sanctions award, this Court found that the plaintiff had misrepresented his ownership of a copyright which allowed the case to proceed unnecessarily for three additional years. In contrast to a Supreme Court opinion that terminated the cause of action alleged, the Appellees asserted that the Indiana district court decision in *United States ex rel. Leveski v. ITT Edu. Svcs*. Terminated the claims Relators filed against Corinthian, a decision that was reversed by the Seventh Circuit. E&Y made a complete reversal of position after Seventh Circuit reversed, to-wit:  *Counsel drastically overstates the relevant of **Leveski** to this case."* Dkt. 35, p. 31, E&Y Answering Brief.


**L.      American Rule on Attorney's Fees requires Bad Faith**

Absent bad faith or abusive litigation, or a specific statute, each party is responsible for its own attorney's fees under the American Rule. *Alyeska Pipeline Services Co. v. Wilderness Society*, 421 U.S. 240 (1973). Attorney's fees may not be awarded "merely because a party has lost a case or offended some legal norm" under *Alyeska* and its progeny. *Zambrano, id.* at 1481. There are only narrowly

defined circumstances where a federal court may exercise its inherent authority powers to tax attorney's fees. "Under the Supreme Court's interpretation of the 1853 Fees Act and subsequent statutes, it is clear that "Congress meant to impose rigid controls on cost-shifting in federal courts." *Zambrano, id.*, *citing Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437 (1987).

## M.  Defense counsel's billing records filed *in camera*

Appellees argues that Relators waived objection to *in camera* review of the billing records. The record does not contain a finding of "good cause" required by Fed. R. Civ. P. 26 to support *in camera* review of the billing records. Appellees waived their attorney-client privilege in the billing records by asserting a claim that put the attorney billing records directly in issue. *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1162-63 (9th Cir. 1992). Appellants were ordered to pay $1.5 million in attorney's fees while completely denied access to the billing records, thereby depriving the proceedings of fundamental fairness and due process. To allow Appellees to hide behind privilege to withhold their attorney billing records is manifestly unfair to Appellants. *Home Indem. Co. v. Lane Powell Moss & Miller*, 43 F.3d 1322, 1326 (9th Cir. 1995).

Moreover, while Appellees urge that the district court made a "careful review of the billing records" in finding the hours were "'reasonably expended'" and that the "tasks included in the records do not appear to be duplicative of one

another," Appellants were entitled to examine the evidence presented against them in support of a $1.5 million sanctions.

**CONCLUSION**

Despite the fact that *University of Phoenix* settled years after the instant suit was filed, Appellees continue to insist that "[t]he district court's factual findings, such as that a complaint was filed … for an improper purpose, are afforded '*great deference*' … ." Dkt. 36-1, p. 24. Corinthian and E&Y urge the Court to affirm the district court's findings of fact by simply pretending that the chronologically impossible reasoning of "improper purpose" based on the *University of Phoenix* settlement did in fact occur.

> *Counsel brought this action for an improper purpose.* The district court was more than justified in awarding sanctions based on its ***well-founded conclusion*** that Counsel filed suit with the "improper purpose" of extracting an undeserved settlement. [citations omitted].

Dkt. 36-1, p. 3. Appellees insist they are entitled to their own set of the facts of the case, facts which have no basis in reality, *i.e.,* that Relators could somehow have been "spurred" to file suit based on the $67 million *University of Phoenix* settlement. Neither Appellee concedes the error of district court's finding that counsel manufactured the Corinthian lawsuit after the $67 settlement in the *University of Phoenix*. E&Y specifically disputes that was "chronologically

impossible" for Relators to file suit based on the *Phoenix* settlement. This clearly

demonstrates why the Court should not take Appellees' arguments seriously.

Relator Mshuja admitted that he was "spur[red] to file this lawsuit because of the settlement reached in the *Hendow* case (involving the University of Phoenix), in which Relators received a $19 million cut of a $67 million settlement.

Respectfully submitted:

By:_____// SDL //_____

Scott D. Levy
Scott D.Levy & Associates PC
Tex. Bar No. 24000598
1844 Wheeler Street
Houston, Texas 77005
Tel: (713) 528-5409
Fax: (713) 528-0117
Email: levy.scott@mac.com

28

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B). The brief contains 6610 words excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      The brief complies with the typeface requirements of Fed. R. App. P. 32(a)(6) because the brief was prepared in proportionately spaced typeface using Microsoft Word in 14 point Times New Roman.

s/  Scott D. Levy_____
Scott D. Levy

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that all parties have been served with the foregoing reply brief using the Court's ECF system this 24th day of March 2014.

_____ // SDL //_____

Dated:  March 24, 2014